IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. WR-44,330-02






EX PARTE STEVE RODRIGUEZ, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


NO. 91-CR-2045-W2


IN THE 227
TH JUDICIAL DISTRICT COURT


FROM BEXAR COUNTY






 Cochran, J., filed a statement concurring in the denial of relief in which
Price, J. joined.



STATEMENT



 In this subsequent writ application, filed pursuant to Article 11.071, § 5, of the Texas
Code of Criminal Procedure, applicant presents a claim of mental retardation under Atkins
v. Virginia. (1) After we remanded the application, the trial court conducted an evidentiary
hearing and considered a wealth of documentary information. The trial judge then signed
findings of fact and conclusions of law and recommended that relief be denied. We have
reviewed the record, and we adopt the trial judge's findings and conclusions. Therefore, we
deny relief. 

 Because this case presents a close question on the ultimate factual issue of mental
retardation, I add the following remarks.

I. Applicant was indicted for the murder of Agnes Herden committed in the course of
a burglary or robbery on July 4, 1990. Against his attorney's advice, applicant pleaded guilty
to the capital murder charge. At his 1992 trial, the jury answered the two "aggravating"
special issues affirmatively and the mitigation issue negatively, and the trial judge sentenced
applicant to death. This Court affirmed that conviction and sentence on direct appeal. 
Rodriguez v. State, 899 S.W.2d 658 (Tex. Crim. App. 1995). 

 The evidence at trial showed that applicant had entered Ms. Herden's home in the
early hours of the morning, stabbed the 80-year-old woman in the face, neck, and upper
chest, hit her with a blunt object, and left her dead in her bed. He stole two television
sets-both of which were left abandoned outside the home-some jewelry, and a pistol. At
4:30 a.m., applicant arrived at his sister's trailer home where he sprinkled salt and pepper on
the steps in an apparent effort to cover his scent. He soaked his blood-stained clothes in
alcohol. Applicant told two friends who were in the trailer that he had stabbed a "black guy,"
and showed them the jewelry and pistol he had stolen, as well as a knife (later determined
to be the murder weapon) that he had taken with him. Applicant gave one of the men a dollar
to buy a can of spray paint, and the three friends inhaled paint fumes until noon, when police
officers came to the trailer. Applicant told his friends that he needed to hide from the police,
but he made no effort to do so. Instead, he lay down on the floor, closed his eyes and
pretended to sleep. The officers arrested him. 

 At first applicant denied committing the murder, but when a police officer confronted
him and told applicant that he knew that this was a lie, applicant gave a full confession. He
explained that

 I just had a lot of things on my mind. I have a lot of family problems because
I can't never talk to my family. I did not rape the lady and I did not have any
sex with the lady. I just lost my mind. This statement is the complete truth as
best I can remember it. I am sorry that I killed the lady and I really didn't
mean to do it.


 During the punishment phase, Dr. James Sherman testified for the State concerning
applicant's mental health testing in 1982 when, at the age of fourteen, he was in the Bexar
County Juvenile Detention Center for "sniffing glue" and auto theft. At that time, applicant
already had a four-year history as a runaway, committing various criminal mischief and theft
offenses. (2) In 1982, applicant described himself to Dr. Sherman as "being a discipline
problem," but he denied having ever been suspended from school or having been in special
education classes. He said that he had no idea what his grades in school were because he
always gave his report card to his sister and did not look at it. His mother had died when he
was five, and he did not know where his father was. He moved around and lived with
various relatives. Although he was only fourteen, he said that he got drunk frequently,
smoked marijuana, and used inhalants "a lot."

 Dr. Sherman testified that his 1982 testing of applicant's overall level of functioning
was measured on the Wechsler Scale as being in the mild (50-70) range of mental
retardation. He had a full-scale IQ of 60, with a verbal score of 57 and a performance score
of 70. Although concluding that applicant was legally competent, Dr. Sherman diagnosed
him as having "overanxious disorder of adolescence," "undersocialized nonaggressive
conduct disorder of adolescence," and "borderline intellectual functioning with a repetitive
language deficit." He recommended that applicant be placed in a special education program
and a stable home, and that he enter into a "behavioral management contract" with his
juvenile probation officer. At the 1991 trial, Dr. Sherman explained that, in his opinion,
applicant's ability to function was "much higher" than his full-scale IQ score of 60 implied. 
Applicant was "absolutely not" mentally retarded, rather he was functioning in the borderline
range.

 Dr. John Sparks also testified for the State. In his opinion, applicant was competent
to stand trial, was not mentally retarded, and was not insane or suffering from any severe
mental disease or defect. He found no sign of organic brain damage which is often
associated with inhalant abuse. He stated that even though applicant's most recent IQ score
of 68 was in a "range that would normally be retarded," he believed that applicant "was much
more able to adapt to the community and function" than his IQ score suggested. Dr. Sparks
explained that applicant deals with things "on a primitive level," but "[h]e takes care of
himself. He is able to find a place to stay. He makes relationships reasonably well. He's not
an isolated, withdrawn person."

 During closing arguments at the punishment stage, applicant's attorney argued that
applicant was both mentally ill and mentally retarded. Nonetheless, the jury did not find that
there were sufficient mitigating circumstances to warrant a sentence of life imprisonment
rather than a death sentence. (3) Therefore, the trial court imposed a sentence of death.

 In his first habeas application, applicant claimed that his trial attorneys failed to
request the assistance of a "partisan" psychiatrist to evaluate his mental functioning, and,
therefore, they provided ineffective assistance of counsel. At this hearing, Dr. Michael
Arambula testified for applicant and stated that, in his opinion, applicant was mildly mentally
retarded and functioned "right at" the line that separates mild mental retardation from
borderline intellectual functioning. He found that applicant functioned like a six-to-eight-year-old child in some areas and a twelve-to-thirteen-year-old in others. In Dr. Arambula's
opinion, applicant had significant impairments in ten out of eleven specific adaptive behavior
categories. He had an "unfortunate upbringing" and a long history of depression and very
significant anxiety which made him have trouble concentrating, impaired his decisionmaking,
and led to low self-esteem and irritability. (4) With his long-term inhalant abuse, applicant
acted impulsively, was easily agitated, and could not think clearly. Because of the interaction
between a low intellectual level, clinical depression, and inhalant-affected behaviors, he was
going to be "more irritable, can't concentrate, be hyperactive .... He probably would be
disruptive in class because he can't sit still." However, Dr. Arambula also agreed that
applicant's impulsivity and poor judgment would "be a common characteristic of a 22 or 23-
year-old school drop out from a broken home with a history of drug use." 

 Dr. Margot Zuelzer, a psychologist who also testified for applicant at this first habeas
hearing, tested his IQ and believed that applicant's verbal IQ score of 68 indicated mental
retardation, even though his overall score of 71 was not in the retarded range, and his
performance IQ of 77 was outside the range of mental retardation. She noted that applicant
is "functionally illiterate" and has a "language positing problem." 

 Dr. Sparks testified again at the first habeas hearing and largely agreed with Drs.
Arambula and Zuelzer. He noted that everyone concurred that applicant was "at the
borderline" or "on the cusp" of mental retardation, but that "[t]here aren't any exact cutoffs
between the various groupings ... they blend sometimes into each other .... The borderline
really is a judgmental borderline. ... It's not an exact line separating one from the other." Dr.
Sparks believed that applicant fell on the "not mentally retarded" side of the line because he
functioned at a higher level than his IQ scores would otherwise indicate, except in the area
of academic achievement.

 According to one of applicant's sisters who testified at the first habeas hearing,
applicant was a good student when he first started school, but he began having problems after
his mother died. She also knew he had problems with spray paint, but she never saw him
inhaling it. Another sister testified that applicant was sometimes a "troublemaker" who used
to fight when he was young. The mother of applicant's child testified that applicant used
spray paint "all the time" when they were living together. Applicant worked for his brother-in-law in the construction business, but couldn't get a good job because he wasn't very smart. 
One of applicant's trial attorneys testified at the habeas hearing that he never noticed any
mental retardation disability in his client.

 This court denied relief on that first habeas application on April 12, 2000. Applicant
then sought habeas relief in federal district court. While this writ was still pending, but after
the Supreme Court delivered its opinion in Atkins, applicant filed a subsequent federal writ
raising a mental retardation claim. On March 31, 2003, the federal district court dismissed
that petition without prejudice so that applicant could return to state court to raise his Atkins
claim and then, should it be necessary, he could return to federal court after exhausting state
remedies. Rodriguez v. Cockrell, Civil No. SA-00-CA-743EP (W.D. Tex. March 31, 2003). 
On September 10, 2003, this Court entered an order finding that applicant had met the
threshold criteria for raising a subsequent claim under Tex. Code Crim. Proc. Art. 11.071,
§ 5, and we remanded the case to the trial court for further proceedings.

 On remand, the trial court heard additional testimony concerning applicant's mental
abilities. Dr. Sherman testified again and stated that the fact that a person has a subaverage
IQ score does not necessarily mean that he is mentally retarded. An IQ score is indicative
of a lessened capacity for doing well in academics, but environmental factors-a stable home,
supportive parents, a stable school situation, the language spoken in the home, peer groups,
alcohol and drug abuse-all influence academic achievement and impact IQ scores. Dr.
Sherman believed that applicant was severely learning disabled and did not test well. He
noted that "the whole verbal spectrum of the IQ test is really culturally based," and therefore
a lack of academic achievement and a low reading ability will "inhibit your performance on
the test." Dr. Sherman also expressed his concern that the adaptive deficiencies prong of
mental retardation had no objective or quantifiable component.

 Dr. Sparks testified again as well. He, too, expressed concern that the adaptive
functioning criteria of mental retardation are not objective: "There's a great deal of
subjective input. The observation of the individual, the history that he gives, the history
obtained from other sources like family or work history, if there is work history." The
determination of whether one has significant adaptive skills deficits is really "a judgment
call." Although admitting that it was "a close call," Dr. Sparks reiterated his opinion that
applicant was not mentally retarded. His opinion was based upon the facts that applicant
worked; had relationships with other people, including family; and had the "ability to adapt
to some level above what I would expect a retarded person to adapt in our society." Dr.
Sparks also explained that applicant "tested badly" because of his high anxiety and low
motivation levels. Dr. Sparks noted that applicant could communicate reasonably well while
in jail and that his "sick call requests" were written very logically and asked for specific
things. Applicant wrote his medical form information "at a level that's higher than any
retarded person could."

 Dr. Jim Patton, an adjunct professor of special education at the University of Texas,
testified for applicant at the second writ hearing and he agreed with Dr. Sparks that there is
a "moderate" correlation between intellectual ability and adaptive behavior. Dr. Patton
interviewed applicant and some of his family members and concluded that applicant had
shown evidence of adaptive skill deficits before age eighteen, particularly in the areas of
communication and academic achievement. He had no opinion whether applicant was
presently mentally retarded. 

 The trial court also considered a written affidavit by Dr. Ruth Luckasson, a special
education professor at the University of New Mexico. She did not evaluate applicant
personally, but stated that the opinions of Drs. Sparks and Sherman that applicant was
"borderline and did not have deficits in adaptive skill areas," were not supported by their
records. She thought that the clinical data developed by Drs. Sparks and Sherman support
a diagnosis of mental retardation.

 The State offered applicant's prison records that show he was a member of the
Mexican Mafia and that he had numerous disciplinary violations. A recent prison mental
status examination report concluded that applicant's adaptive skills were "normal" as to
coping ability and that he had no skills deficit.

II.


 The trial court has now made its findings of fact and conclusions of law based upon
the entirety of the testimony and records. The trial court summarized its conclusion in the
following manner:

 The applicant had the burden to establish by a preponderance of the
evidence each of the three elements of mental retardation: onset during the
developmental period, subaverage intellectual functioning, and significant
deficits in adaptive skills. The applicant has failed to establish significant
deficits in adaptive skills. The expert evidence is in conflict, but the question
is not necessarily controlled by expert testing. There is lay evidence in the
form of observations by prison and state school officials that applicant did not
have significant adaptive deficits. There is evidence that helps explain why
applicant could have poor I.Q. scores and yet not have adaptive skills deficits
and thus not be mentally retarded. There is evidence that applicant is not
docile or easily manipulated by others, and is in fact aggressive and
manipulative. There is evidence that applicant is able to communicate and
function in his environment.


Based upon those factual findings and legal conclusions, the trial court recommends that this
Court deny relief.

 All of the experts agreed that applicant's numerical IQ level is at the borderline or
below the cut-off level for a diagnosis of mental retardation. There is also expert and lay
witness evidence in this record which would support a finding that applicant does suffer a
deficit in adaptive skills, and there is evidence in this record which supports the trial court's
finding that applicant does not suffer a deficit in adaptive skills. A finding on either side of
this question is supportable by the record evidence. But as a court reviewing only the cold
record, we must be especially deferential to the trial court's factual findings as he is "Johnny-on-the-Spot" and able to make credibility and demeanor determinations of the witnesses that
we are not capable of making on habeas review. (5) There are also statements in the two habeas
hearings that the trial court and advocates were personally familiar with both Drs. Sherman
and Sparks and their experience and expertise in the mental health field.

 I nonetheless reiterate my concern that "[t]he adaptive behavior criteria are
exceedingly subjective, and undoubtedly experts will be found to offer opinions on both sides
of the issue in most cases." (6) 

 It seems to me that, with its decision in Atkins, the Supreme Court is moving back
toward the pre-Furman days of wholly subjective criteria in determining whether a particular
person is or is not subject to the death penalty. (7) As experts on both sides in this case
testified, there are no objectively verifiable standards by which to gauge whether a specific
person does or does not suffer the kind of significant "adaptive deficits" that a diagnosis of
mental retardation requires. Nor are there any scientifically verifiable standards by which
one might measure whether a person's academic, social, or functional deficits are related to
innate mental deficiencies, bad upbringing, impoverished environment, bad moral character,
emotional problems, poor habits, lack of motivation, drug or alcohol dependence, or other
factors. 

 As school children we were taught that King Solomon weighed all of the evidence
before him and made a reasoned decision; Nero divined merit on a whim and just pointed his
thumb up or down. I fear that, under Atkins and the subjective legal definition of the
"adaptive deficits" prong of mental retardation, we are moving farther from King Solomon
and closer to Nero. If there is evidence in the record to support the factfinder's conclusion,
by a preponderance of the evidence, that a person does or does not suffer from significant
"deficits in adaptive behavior"-- whatever that may mean to the factfinder-that conclusion
must be affirmed. 

 In Atkins, the Supreme Court may have intended to create a "bright-line" rule that
those who are mentally retarded are, because of their lesser moral culpability, exempt from
the death penalty. But I fear that there is no such bright line. There is, on the contrary, broad
agreement among mental health experts that determining whether a person suffers from the
type and level of "adaptive deficits" that qualifies for a mental retardation diagnosis is highly
subjective and largely a matter of individual judgment. Under Atkins, the ostensible issue
for the factfinder in a death penalty case is, "Is this person mentally retarded?" As we see
in this case, there may be no clear-cut answer to that question. Absent the possibility of a
rigorous, scientifically reliable and verifiable "yes-or-no" determination, the relevant
question perhaps ought to be, "Do you believe that the defendant is sufficiently mentally
responsible for his conduct such that the death penalty is an appropriate punishment?" This
is analogous to the Texas statutory mitigation question which, at bottom, asks "Do you
believe that the defendant is sufficiently morally responsible for his conduct such that the
death penalty is an appropriate punishment?" 

 In any event, the "evolving standards of decency" of the Eighth Amendment (8) depends
upon the collective judgment of the twelve ordinary citizens who sit in judgment of the case
before them. Their assessment is the best determinant of fairness in assessing both mental
and moral responsibility in cases of capital crimes committed by those whose mental capacity
and competency is in doubt. Thomas Jefferson had it right: "I know of no safe depository
of the ultimate powers of the society but the people themselves, and if we think them not
enlightened enough to exercise that control with a wholesome discretion, the remedy is not
to take it from them, but to inform their discretion." (9) Expert testimony and various mental
retardation criteria may inform the factfinder's discretion. But it is nonetheless the factfinder
who must ultimately decide whether a particular person "who claim[s] to be mentally
retarded will be so impaired as to fall within the range of mentally retarded offenders about
whom there is a national consensus" (10) that the death penalty is an inappropriate punishment.

 Based upon the evidence in the record, I agree that the trial court did not err in
concluding that applicant failed to prove, by a preponderance of the evidence, that he is
mentally retarded. Therefore, I join the Court in denying applicant relief on his mental
retardation claim.


Cochran, J.

Filed: June 15, 2005

Publish 
1. 536 U.S. 304 (2002).
2. Evidence at the capital murder trial showed that applicant and his friends accosted other,
smaller children, stole their bikes, and threatened to beat them up with chains and sticks.
3. Tex. Code Crim. Proc. art. 37.0711, §3(e).
4. Dr. Arambula testified that applicant's extensive record for prison disturbances,
including one incident in which he stabbed a fellow inmate five times, may have been the result
of his depression and "because he was so anxious."
5. Ex parte Briseno, 135 S.W.3d 1, 12-13 (Tex. Crim. App. 2004) (in habeas context, "we
afford almost total deference to the trial judge's determination of the historical facts supported by
the record, especially when those fact findings are based on an evaluation of credibility and
demeanor. However, if the trial court's ruling is not supported by the record, this Court may
reject the findings") (footnote omitted); Ex parte Franklin, 72 S.W.3d at 671, 675, n.5 (Tex.
Crim. App. 2002) ("although this Court is not bound by the findings of the trial court in post-conviction habeas corpus proceedings, such findings are considered if supported by the record");
Ex parte Evans, 964 S.W.2d 643, 648 (Tex. Crim. App. 1998) ("while this Court is not bound by
the findings of a habeas judge in a habeas corpus proceeding, where the findings are supported by
the record, they should be accepted by this Court"). 
6. Ex parte Briseno, 135 S.W.3d at 8.
7. Furman v. Georgia, 408 U.S. 238, 310 (1972) (Stewart, J., concurring) (state death
penalty statutes were unconstitutional because they gave juries "open-ended, unstructured
discretion" in deciding whether to impose death penalty); compare Jurek v. Texas, 428 U.S. 262,
273-74 (1976) (joint opinion of Stewart, Powell, & Stevens, JJ.) (holding Texas death penalty
statute constitutional because it "guided and focused the jury's objective consideration of the
particularized circumstances and the individual offense and the individual offender").
8. Atkins, 536 U.S. at 321 (holding that execution of those found to be mentally retarded is
excessive under the "evolving standards of decency" of the Eighth Amendment).
9. Thomas Jefferson, letter to William Charles Jarvis, September 28, 1820.
10. Atkins, 536 U.S. at 317.